Mr. Justice MILLER
(with whom concurred WAYNE and CLIFFORD, JJ.) dissenting:
In this case seven members of the court heard the argument and participated in its decision. Of this number only four concur in the judgment and opinion of the court. These facts, as well as the importance of the main question whether the act of the California, legislature concerning pilots is in conflict with the act of Congress of 1852 on the same subject, and, therefore, void, justify a statement of the views of the minority.
There was a preliminary point, however, raised by the Attorney-General of California, much pressed and well- argued on both sides, on which I had hoped the case would have been decided without reaching the question just stated; a point I think well taken, and fully sustained by'the authorities. The proposition is, that the statute of California, *464 under which plaintiff below recovered his judgment, has been repealed since the writ of error was sued to this court; and that the action being wholly dependent on the statute, the repeal takes away the right, and the judgment which he has obtained must be reversed, and the case dismissed.
That the 26th section of the act of April 4th, 1864,* does, in express terms, repeal the act under which plaintiff’s proceeding was instituted, is not denied. It is equally clear that there is no clause in the act of 1864 saving rights which had accrued under the act repealed. I take the law to be well settled that a right of action not growing out of contract, but which is solely dependent upon a statute, ceases and determines with the statute on which it depends.
One of the earliest cases on that subject is Miller’s Case.† That was a case in which Miller had been made, under a compulsory clause in a statute of insolvency, to give in a schedule of his property, and deliver it up to his creditors. The statute then authorized a discharge from all his debts. He accordingly moved for such discharge. But the justices of the county court for some reason delayed this from time to time, until the compulsory clause of the act was repealed, and then refused it altogether. On an application for mandamus in the King’s Bench, Lord Mansfield held that the repeal of the law carried with it the right to a discharge, and overruled the application. In Surtees v. Ellison,‡ where the same question was raised on an act repéaling the bankrupt law then in existence, Lord Tenterden said, that notwithstanding the disastrous effect of the repeal on previous cases of bankruptcy, and on proceedings then in progress under the act, they were not at liberty to break in upon the general rule. In the subsequent case of Key v. Goodwin,§ Tindal, C. J., says: “I take the effect of.the repealing statute to be to obliterate the repealed statute as completely from the records of Parliament as if it had never passed, and that it must be considered as a law that never existed, except for *465 the purpose of those actions or suits which were commenced, prosecuted, and concluded while it was an existing law.”
This principle is also sustained by numerous American cases, cited in the note below.*
It is maintained, however, that in this court, on a writ of error, we can only determine if there was error in the record as the law stood at the time the decision of the court, was made, which is brought here for review.
In the cases of Hartung v. The People, and Sanches v. The People,† which are very recent cases, and were much considered, the Court of Appeals of New York unanimously held, that while on a writ of error, the case must be decided on the record as made in the court below, the question of error or no error must be determined by the law as it stands at the time the case is heard in the Court of Appeal. Such, also, is the decision in the Pennsylvania case of Commonwealth v. Duane,‡ Avhich was an indictment for libel, in which the statute on which it was founded was repealed after the dofend'aut had been found guilty in the court below, and the appellate court held that for that reason the case must bo reversed, and the libel dismissed. Lewis v. Foster,§ in the Supreme Court of New Hampshire, decides the same thing on a case of review under their statute. The cases of. Yeaton v. United States,|| and Schooner Rachel,¶ in this court, decide, that on appeal from an admiralty decree, that decree will be reversed, because the law under which the vessel became forfeited had expired by its own limitation pending the appeal, although the vessel had been sold and the money paid into the Treasury of the United States before the statute expired.
Unquestionably, the appellate tribunal is bound to take *466 judicial notice of the repealing statute. If so, I fail to see how it can affirm a judgment, which, by the law in existence at the time of such affirmance, has become erroneous, though not so when rendered. And so are the authorities without exception, as far as I am aware.
But it is said that plaintiff, by his judgment in the court below, acquired a vested right to the sum of money for which he recovered that judgment, which could not be taken away by a repeal of the act.
I deny .that a party suing another for a statute penalty can acquire .a vested right in the sum which the law allows in such cases, until he has actually received the money into his own possession. Such is evidently the principle deducible from the eases of Yeaton v. United States, and the Schooner Rachel, above referred to. Such is also the express decision of this court in the case of Norris v. Crocker,* except that in that case the repeal took place while the suit was pending and before judgment. . This court held, in the language of Judge Catron, that, “ as the plaintiff had no vested right in the penalty, the legislature might discharge the defendant by. repealing the law.”
A judgment is only one of the steps in the progress of a suit by which the plaintiff, if successful, obtains what, he is seeking. It only declares the right of the party, but does not create it. ■ It may be set aside or reversed, and gives the plaintiff no right superior to that which he had before he obtained it.
' If the claim on which he proceeded was a vested right, it remains so after judgment; not because of the judgment, but because it existed before, and the’judgment only ascertains that fact, and enables him to enforce it. If the judgment was founded on a statute right, it still only declares that on the facts as the law then stood, the plaintiff was entitled to recover; but that right is no more sacred or no more protected from legislative action than before. If there is such a thing as a vested right in a statute penalty, it'must become *467 vested either when the facts occur which give the right, or when the plaintiff makes his claim to the benefit of the statute by commencing an action for the sum which the law allows. That no such right accrues from either of those circumstances, the cases which I have last cited seem conclusive.
But it is said that although the act of April 4th, 1-864, repeals the prior act, it re-enacted the same provisions on the subject of pilots, and that this opei’ates as a continuance of-the former law. It may he answered that if such were the intention of the framers of the new law, the repealing clause is not only useless, but, if effectual, it must operate to defeat that intention. In the next place, .the appropriate and usual mode of expressing such an intention is by. a saving clause; and, lastly, by a well-settled rule of construction, the new statute can have ho retrospective operation, unless by its own express language, or by necessary implication,— neither of which exist in this case. The case of the Board of Trustees v. City of Chicago,* was one where proceedings to condemn property for public use were instituted under the city charter. While they were pending, the legislature passed an act which amounted to a new charter, but which contained no repealing clause. The Supreme Court held that the new charter by implication repealed the old one; and although it granted the right to condemn as the other one had’ done, yet the right to proceed under the old charter ivas gone, and the party must begin and proceed under the new one.
No authority, I' believe, can b,e found to controvert this principle. The remark of C. J. Shaw concerning the neces-, sity of so construing the Revised Statutes of Massachusetts, when the entire laws of the State had been revised and reenacted, as to prevent a total lapse of all rights existing under the statutes thus revised, can have no application to the case of a single statute expressly repealed by a clause in a new law on the same subject.
It is contended by counsel in the argument that the judg *468 ment in this case is based on contract, and that no repeal of the statute by State law can impair its obligation. This idea seems to me without foundation. The statute enacts, for the protection of the pilots of San Francisco, that a vessel approaching or leaving the harbor shall employ the first pilot, licensed under that law, who offers his services; and if the officers of the boat refuse, it renders the owners liable in an action by that pilot to half the" usual pilot lees. If the officers of the vessel accept the pilot and his services, unquestionably the law implies a contract to pay either what they may reasonably be worth, or the sum fixed by statute. But if they refuse to accept him or his services, they violate the law; for which violation it imposes the penalty of half the usual pilot fees. Here is no element of contract; no consent of’minds; no services rendered for which the law implies an obligation to pay. It is purely a case of a violation of the law in refusing to perform what it enjoins, and the enforcement of the penalty for the benefit of the party injured. It is just as easy to see a contract in a hundred other cases where the law imposes a penalty for its violation, and gives an action of debt for the recovery of that penalty.
It is my opinion, then, that we should have reversed the judgment, and ordered the dismissal of the ease on the grounds just discussed.
.As regards the merits of the case, it seems to me still clearer that the judgment should have been reversed. The case of Cooley v. The Board of Wardens,* raises the question of the relation of pilots and pilotage to commerce, and holds that the power of regulating pilots by law, and framing a system for their government and control, is clearly conferred upon Co.ngress by the Constitution. It also holds that in the absence of the exercise of that power by Congress, the States may provide such rules and regulations on the subject as may bo necessary and proper; but the implication is forcible, that if any such regulation is in conflict with any act of Congress, *469 it is void; and, indeed, that if Congress has legislated on the same subject with a view to provide a'system of rules, that there is no place left for State legislation.. The proposition is too plain for argument, that, if Congress has power to pass such laws, and has passed them, any act of a State legislature in conflict with them must necessarily be void. I do not understand the majority of the court to controvert this principle, or even to deny that if Congress has legislated on this .precise subject, and provided rules for this very class of cases, that then the act of the legislature of California is to that extent void. But the precise point of difference between us is, that while I contend that an act of Congress of August 30th, 1852, covers the subject-matter of the statute of California under which defendant in error claims, they deny that it does cover the case, or was intended to apply to pilots of harbors and ports of the several States.
That act is in terms confined to vessels propelled in whole or in part by steam; and its object, as stated in the title, is the better security of the lives of passengers on board such vessels. The ninth section of the act, which is <a very long section, composed of fifteen subsections, opens by declaring, “ That instead of the existing provisions of law for the inspection of steamers and their equipments, and instead of the ■present system of pilotage of such vessels, and the present mode of employing engineers on board the same, the following regulations shall be observed, to wit.” IT?.. e, then, is a declaration that it is the purpose of the act to abolish the old systems, and-establish new ones on three distinct subjects : 1st, as to the inspection of steamers and their equipments ; 2d, as to a system of pilotage; and 3d, as to the mode of employing engineers. The regulations adopted by this act are declared to be “instead of the (then).present system of pilotage.” "What system of pilotage was then in existence? Certainly none had been established by Congress. The act of 1838, to which this was an amendment, 'does not say a. word about pilots or engineers. The acts of August 7th, 1789, and March 2d, 1837, had provided that State regulations should'prevail until further action by Con *470 gress. The system of pilotage, then, which was in existence when the act of 1852 was passed, was the State regulations of each port, almost all of which are substantially the same with the act of the California legislature of 1861. And it was this system-which-was to lie superseded, and the one provided in the act of Congress introduced in its stead. This idea derives support from the significant fact that the decision of this court, holding that the State regulations were in force because no system had been adopted by Congress, was made in the winter of 1851-2; and this act, which provides such a system, was passed by Congress, August 30th, 1852. Unquestionably, Congress intended to supply that very system which the Supreme Court had intimated was needed, and was in the power of Congress to provide.
Let us examine, now, some of the provisions of this act which concern pilots.
Section nine creates a board of inspectors in each of twenty-three different ports of the Union, including San Francisco. Subdivision seven of that section says, that these inspectors shall license and classify all engineers and pilots of' steamers carrying passengers. Subdivision nine says: “Whenever any person, claiming to be a skilful pilot for any such vessel, shall offer himself for a license, the board shall make diligent inquiry as to liis character and merits, and if satisfied that he possesses the requisite skill, and is trustworthy and faithful, they shall give him a certificate to that effect, licensing him for one year to be a pilot of any such vessel, within the limit prescribed in such certificateIt also provides for revocation of the license for proper cause.
Subsection ten says: “ It shall be unlawful' for any person to employ, or any person to serve, as engineer or pilot on any such vessel who is not licensed by the inspectors; and any one so offending shall forfeit one hundred dollars for such offence.”
Subsections thirteen and fifteen of section 9, and sections 20 and 38, all provide that these pilots shall be under the control of the boards of inspectors; shall take an oath to discharge their duties faithfully; and shall'be liable to re *471 moval and other penalties for unfaithful or unskilful conduct.
Section 2-3 requires the collectors of each port to report to the collectors of every other port the pilots licensed at their respective ports. From this provision the port of San Fi’an-cisco is excepted. The obvious reason is, that being the only port on the Pacific coast where, a board of inspectors is established by the law, there is no reason to suppose that .pilots will be licensed at other ports for that coast, or at San Francisco for any other than the Pacific coast and ports.
In these enactments, and in the regulations which are authorized to be made of a set of signals in passing each other, we see a system of pilotage as complete, or more so, than any which had previously existed, and, in my judgment, one more judicious, and better calculated to secure safety of life and property than the one provided by the California statute. If, then, the principle be a sound one that, when Congress has provided such a system, those existing under State laws must give way, and if, as it appears manifestly from this act, the system thus provided was intended to be instead of and in exclusion of the State systems, how can the act of the California legislature stand ?
It is said that the act of Congress was only intended to provide pilots for a voyage, and is not applicable to the local pilots of the ports. I am not able to perceive anything in the relation of these port'pilots to the Federal Government and its right 'to regulate commerce, or in the nature of the special service which they are expected to perform, which can furnish any ground for this distinction. All the other regulations of eommórce extend to the ports, and they are emphatically the theatre where commercial regulations are most needed, and where Congress has oftenest exercised its' power to regulate commerce. As to the services usually rendered by these pilots, if they are more difficult and require a higher degree of skill than others, there would seem to be the greater neeessity.why they should be thoroughly examined and licensed by the proper authority, and also why they should be under the control of proper officers, and subjected *472 to laws and rules calculated to compel a strict performance of their duties. All those are well provided for in the act of Congress.
It seems to be supposed, however, that the pilots licensed under the act of Congress must necessarily be for long voyages, and that such licenses cannot issue limited to the bays and harbors of the various ports. This is a groat mistake. The board of inspectors for each port should be as competent to determine the qualifications of these local pilots as any such examiners appointed by the State. That portion of subsection nine of section 9, which I have quoted in italics, says that they arc to license a person “ to bo a pilot on any such vessel within the limits prescribed in his certificate.” If, then, the pilot licensed is particularly skilled as a port pilot, and competent for no more, his license will restrict him accordingly. If he is competent for the voyage and not for the harbor, his license will .exclude him from piloting in the harbor. This idea is in direct conflict with the language of the act of Congress, which declares that the boards of inspectors “ shall license and classify all engineers and pilots of steamers carrying passengers.” The opinion assumes, in the face of this language, that there may be a very largo class of pilots allowed to exercise their profession without such a license.
Again, all these regulations apply in the same terms of license and prohibition to engineers and pilots. But can it be pretended that a vessel may go into a port and out of it without a licensed engineer, and yet be guilty of no violation of the law ? If the statute is only applicable to pilots on a voyage, it must also apply only to engineers on a voyage.
But it is argued that the whole system of pilotage relates to the voyage, and does not include the ports; because a proviso to subdivision ten of section nine says, that if the owners of the boat shall, without default of theirs, be deprived of the services of a licensed pilot or engineer on the voyage, they shall be relieved of the penalty which the law imposes for navigating their vessel without one, until such time as they can procure a licensed pilot or engineer. From *473 this pi’oviso I draw an inference precisely the reverse. For this statute evidently means, that if this loss of the services of a licensed pilot or engineer takes place before the port is left, it is no protection against the penalty, because it may be supplied. And so if it occurs after the port is left, and is not supplied by a licensed pilot as soon as you approach the port where one can be obtained, the protection ceases.
It may be urged that the system provided by Congress is incomplete, because there is no provision for compensation of pilots, and none for compelling vessels to accept, in their due order or rotation, those who may offer. Congress may well have thought that these matters might be prudently left to the laws of supply and demand, and to the ability of the parties concerned to take care of their own interests.
If this principle prevails, that the ports aye exempt from the law of Congress as to pilots, I expect to see every town on the lakes, the Mississippi and Ohio Rivers, as well as all their tributaries, passing its ordinances, that, when steamboats come within a mile of their landing they must stop and take on board a local pilot, or pay him compensation for refusal. If the States where seaports exist can make laws thus to burden commerce, I see no reason why the States which have towns on navigable rivers should not pass similar laws. I may add here, that if we permit the States to interject their legislation at every point, however minute or unimportant., which they may fancy that Congress has left unoccupied ; then in all that class of cases in which it has been held that the States may legislate until Congress acts on the subject, we shall have this piebald, conflicting, and incongruous system of laws, with a persistent struggle, on the part of the States, to control the legislation of Congress.
But iiot only is the act of the California legislature void, because Congress has provided a system of pilotage which is in its nature exclusive, but it is also void because its provisions are in direct conflict with the act of Congress. The statute of California provides, that if one of the pilots which it recognizes shall offer his services to a vessel and is refused, the owner of the vessel shall pay the penalty; and it does not *474 require, as condition for claiming this penalty, tliat such pilot shall have the license required by act of Congress. The act of Congress provides, that if any person shall be employed as a pilot on such vessel without such license as it prescribes, the owner shall forfeit the sum of one hundred dollars. Here is a manifest conflict. It is made a part of this case, as found by the court below, that the plaintiff did not have any such license as the act of Congress required. Defendant, notwithstanding this, has been compelled by the State court, under the State law, to pay fifty-two dollars for refusing to take this pilot. If he had accepted him, he would have forfeited to the United States the sum of one hundred dollars for violating the act of Congress. The conflict of the two statutes is too obvious for comment. I think the act of Congress ought to prevail.

 Statutes of California, 1863-4, page 392.

 1 William Blackstone, 451; S. C. more at large in 3 Burrow, 1456.

 9 Barnwall & Cresswell, 750.

 4 Moore & Payne, 341.

 Butler v. Palmer, 1 Hill, N. Y. 324; Hartung v. The People, 22 New York, 95; Sanches v. The People, Id. 155; Commonwealth v. Duane, 1 Binney, 601; Board of Trustees v. City of Chicago, 14 Illinois, 334; Yeaton v. United States, 5 Cranch, 281; Schooner Rachel, 6 Id. 329.

 Cited in note, supra.

 1 Binney, 601; cited supra, in note.

 1 New Hampshire, 61

 5 Cranch, 281.

 6 Id. 329.

 13 Howard, 429.

 14 Illinois, 334.

 12 Howard, 299.